**In re David M. NASON, Sr. and Lois M. Nason, Debtors.**

**THORP CREDIT INC. OF RHODE ISLAND, Plaintiff,**

v.

**David M. NASON and Lois M. Nason, Debtors, Defendants.**

Bankruptcy No. 8100254.
Adv. No. 810198.

United States Bankruptcy Court,
D. Rhode Island.

Sept. 16, 1981.

Louis F. Robbio, Providence, R.I., for plaintiff.

David Hassenfeld, Providence, R.I., for debtors.

ARTHUR N. VOTOLATO, Jr., Bankruptcy Judge.

Heard on Plaintiff, Thorp Credit, Inc.'s, complaint for reclamation of a 1972 Kam "Kamper" camping trailer.

The issues before the Court are: (1) whether a subsequent advance on a prior secured loan requires a new financing statement in order to preserve the lender's security interest, and (2) whether a camper trailer comes within the avoidance provisions of Bankruptcy Code § 522(f)(2), 11 U.S.C. § 522(f)(2).

On March 27, 1978, the Debtors borrowed $1,500.00 from Thorp to purchase the vehicle in question, and a security agreement was executed by the parties on the same date, listing the camper as collateral for the loan. It is agreed that Thorp properly perfected its security interest by filing on April 3, 1978. R.I. Gen Laws § 6A–9–302.

Thorp advanced an additional sum of money to the Debtors on March 21, 1980, and a new promissory note and security agreement were executed. This loan was also secured by the camper. Thorp admits that it did not file a new financing statement in connection with the 1980 loan.

The Debtors filed a voluntary Chapter 7 bankruptcy petition, 11 U.S.C. §§ 701, et seq., on April 2, 1981. In the present complaint, Thorp seeks to reclaim the trailer pursuant to the March 27, 1978 and March 21, 1980 security agreements. The Debtors object to the complaint on two grounds: (1) that Thorp's security interest in the camper was not properly perfected because a new financing statement was not filed at the time of the March 21, 1980 transaction, and (2) that under Bankruptcy Code § 522(f)(2), even if properly perfected, the Debtors may avoid the nonpossessory, nonpurchase-money security interest in the trailer. For the following reasons, both contentions are rejected.

A financing statement is effective for a period of five (5) years from the date of filing, R.I. Gen Laws § 6A–9–403, or until a termination statement is filed, § 6A–9–404. Since no termination statement was filed in this case, the April 3, 1978 financing statement was still in force when the Debtors' bankruptcy petition was filed. The Debtors' argument seems to be [1] that because a new security agreement was executed, the original financing statement does not operate to perfect Thorp's security interest in the same collateral for the second transaction.

The most persuasive authority for their position is the case of *Coin-O-Matic Service Co. v. Rhode Island Hospital Trust Co.*, 3 U.C.C. Rep. 1112 (R.I. Sup'r Court 1966). In that case the court held that "a single financing statement in connection with a

security agreement when no provision is made for future advances is not an umbrella for future advances based upon new security agreements, notwithstanding the fact that involved is the same collateral." *Id.*, at 1120. Since it was rendered, the *Coin-O-Matic* decision has been widely criticized. In addition, the instant case arises after the 1972 amendments proposed by the Review Committee for Article 9 of the Permanent Editorial Board for the Uniform Commercial Code were adopted by Rhode Island [2] and does not involve an intervening creditor to which the *Coin-O-Matic* court gave great deference. The problems this Court has with the *Coin-O-Matic* decision closely parallel the concerns expressed by the authors of the following excerpt:

We reject the *Coin-O-Matic* holding for three reasons. First, it provides little protection against overreaching, for a creditor can avoid the holding simply by including a future advance clause in its security agreement. Second, we suspect that it is a rare banker who will lend against the same collateral which secures a prior loan; in our experience the commercial practice is for the second lender to pay off the first and so take a first priority as to all the collateral. Finally, *Coin-O-Matic* conflicts with the most obvious and we think intended meaning of 9–312(5)(a); if the draftsmen had wished to qualify the rule as the *Coin-O-Matic* court did, they could have done so. In summary it appears that *Coin-O-Matic* may have been aberrational, for other courts have not followed it. A cautious lawyer can protect himself even in Rhode Island by providing for subsequent advances in his security agreement.

White & Summers, Uniform Commercial Code, Section 25–4 (1972).

Because the main purpose of a financing statement is to put third parties on notice

---

1. The Court assumes this is the Debtors' argument, since the question is only mentioned in passing in the Debtors' brief, although it is the sole issue raised in their answer to the complaint.

2. The amendments became effective in Rhode Island on January 1, 1980, P.L. 1979, ch. 172, § 6, and control the issue whether the 1980 security agreement has been perfected. *Id.*, at § 9.

that particular items may be encumbered, with the searcher then required to inquire further for specifics, it need not provide all the information concerning a transaction. *Hobart Corp. v. Little (In re Siravo)*, 27 UCC Rep. 584 (D.R.I.1979); *South County Sand & Gravel Co. v. Bituminous Pavers Co.*, 106 R.I. 178, 256 A.2d 514 (1969). For this reason most courts adhere to the view that a previously filed financing statement is effective to perfect a later security agreement. As the Minnesota Supreme Court has explained

The whole purpose of notice filing would be nullified if a financing statement had to be filed whenever a new transaction took place between a secured party and a debtor. Once a financing statement is on file describing property by type, the entire world is warned, not only that the secured party may already have a security interest in the property of that type (as did plaintiff in the property originally financed), but that it may later acquire a perfected security interest in property of the same type acquired by the debtor in the future. When the debtor does acquire more property of the type referred to in the financing statement already on file, and when a security interest attaches to that property, the perfection is instantaneous and automatic. § 336.9–303(1).

Different fact situations may arise resulting in different arrangements between the secured party and the debtor, all within the contemplation of the code. For instance, in their initial dealings they may contemplate either a number of financing transactions, all secured by the property to which the security interest originally attaches, or they may create a single obligation from the debtor to the secured party, to be secured by property the debtor then owns and additional property that he will later acquire. Furthermore, a transaction between the parties may involve a combination of both of these. Even where the parties originally contemplate a single debt, secured by a single item of property or a single group of items, the secured party and the debtor may enter into further transactions whereby the debtor obtains additional credit and the secured party is granted more security. The validity of such arrangements as against creditors, trustees in bankruptcy, and other secured parties has been widely recognized by many courts. See, *DuBay v. Williams*, 417 F.2d 1277 (9 Cir. 1969); *Grain Merchants of Indiana, Inc. v. Union Bank & Sav. Co.*, 408 F.2d 209 (7 Cir.), certiorari denied sub nom. *France v. Union Bank & Savings Co.*, 396 U.S. 827, 90 S.Ct. 75, 24 L.Ed.2d 78 (1969); *Rosenberg v. Rudnick*, 262 F.Supp. 635 (D.Mass.1967).

Using future-advance clauses and using after-acquired property clauses in the original security agreement are not the only means by which perfected security interests can be obtained in subsequently contracted obligations or in goods the debtor may later come to own. There is nothing exclusive about § 336.9–204(3, 5). Parties may use future-advance and after-acquired clauses, and they are a great convenience. But, if they are not used, there is nothing in the code which prevents the parties from accomplishing the same result by entering into one or more additional security agreements.

Upon a review of decision law in other jurisdictions it would appear that there is a difference of opinion as to perfection and priority of a later advance where it was not made pursuant to the original security agreement but pursuant to a later agreement which may or may not have satisfied the requirements of the code as to security agreements. The better view holds that, where originally a security agreement is executed, an indebtedness created, and a financing statement describing the collateral filed, followed at a later date by another advance made pursuant to a subsequent security agreement covering the same collateral, the lender has a perfected security interest in the collateral not only for the origi-

nal debt but also for the later advance. The instant matter involves a parallel situation. See, *In re Rivet*, 299 F.Supp. 374 (E.D.Mich.1969).

*James Talcott, Inc. v. Franklin Nat'l Bank of Minneapolis*, 292 Minn. 277, 290–92, 194 N.W.2d 775, 10 UCC Rep. 11, 24–26 (1972) (footnotes omitted). *See, also, Stump v. Beneficial Finance Co. of South Dakota*, 8 B.R. 516 (Bkrtcy.D.S.D.1981).

The Review Committee for Article 9, in its Final Report in 1971 with respect to the proposed amendments to Article 9, considered *Coin-O-Matic* and its progeny, *see, e. g., In re Hagler*, 10 U.C.C. Rep. 1285 (E.D.Tenn.1972); *In re Merriman*, 4 U.C.C. Rep. 234 (S.D.Ohio 1967), and concluded:

> The Committee disapproves this line of cases, and believes that an appropriate financing statement may perfect security interests securing advances made under agreements not contemplated at the time of the filing of the financing statement, even if the filing of the advances then contemplated have been fully paid in the interim. Under the notice-filing procedures of the Code, the filing of a financing statement is effective to perfect security interest [sic] as to which the other required elements for perfection exist, whether the security agreement involved is one existing at the date of the filing with an after-acquired property clause or a future advance clause, or whether the applicable security agreement is executed latter . . .
>
> The Committee considered drafting a provision emphasizing its disagreement with the Coin-O-Matic line of cases, but concluded that the existing Code is clear enough, and should not be disturbed just to overrule some lower court cases.

Final Report at 226–7.

Although the Committee did not draft an amendment clarifying the point, it did add a new paragraph to the "Official Comments", which Rhode Island adopted together with the Committee's proposed amendments, indicating that the *Coin-O-Matic* holding is contrary to the intent and letter of Article 9. The Comment states

> even in the case of filings that do not necessarily involve a series of transactions the financing statement is effective to encompass transactions under a security agreement not in existence and not contemplated at the time the notice was filed, if the description of the collateral in the financing statement is broad enough to encompass them. Similarly, the financing statement is valid to cover after-acquired property and future advances under security agreements whether or not mentioned in the financing statement.

Comment 2 to R.I. Gen Laws § 6A–9–402. (1980 Comm.Supp.)

In construing the U.C.C., courts have consistently held that the Official Comments to Article 9 should be given great weight in determining the legislative intent behind the passage of the Article and subsequent amendments to it. *Szabo v. Vinton Motors*, 630 F.2d 1 (1st Cir. 1980); *Weathersby v. Gore*, 556 F.2d 1247 (5th Cir. 1977); *In re Copeland*, 531 F.2d 1195 (3d Cir. 1976); *Jefferson v. Jones*, 286 Md. 544, 408 A.2d 1036 (1979). By adopting the Official Comments to 9–402, the Rhode Island Legislature indicated agreement with the drafters of the amendments to the effect that the *Coin-O-Matic* case was inconsistent with the language, purpose and spirit of the notice filing provisions of Article 9. Such a reading buttresses the goal of the drafters, and the Rhode Island Legislature, "to make uniform the law among the various jurisdictions." § 6A–1–102(2)(c); *In re Copeland, supra; Weathersby v. Gore, supra; Bickett v. W.R. Grace & Co.*, 12 U.C.C.Rep. 629 (W.D.Ky.1972). Therefore, I conclude that the intent of the Rhode Island Legislature was expressed in the adoption of the amendments to the Comments for § 6A–9–402, that *Coin-O-Matic* is no longer the law in this State, and that this is the construction to be given to § 6A–9–402. Accordingly, the 1978 financing statement in this case

operates to perfect Thorp's security interest in the 1980 loan.

■ The second issue presented is whether Thorp's nonpossessory, nonpurchase-money security interest in the trailer may be avoided under Bankruptcy Code § 522(f)(2).[3] At this point the Court must state an unpleasant, but necessary aside.

Section 522(f) provides

Notwithstanding any waiver of exemptions, the debtor may avoid the fixing of a lien on an interest of the debtor in property to the extent that such lien impairs an exemption to which the debtor would have been entitled under subsection (b) of this section, if such lien is—

(1) a judicial lien; or

(2) a nonpossessory, nonpurchase-money security interest in any—

(A) household furnishings, *household goods*, wearing apparel, appliances, books, animals, crops, musical instruments, or jewelry that are held primarily for the personal, family or household use of the debtor or a dependent of the debtor;

(B) implements, professional books, or tools, of the trade of the debtor or the trade of a dependent of the debtor; or

(C) professionally prescribed health aids for the debtor or a dependent of the debtor.

(emphasis added)

However, in his memorandum, the Debtors' attorney quoted the section as follows:

"Notwithstanding any waiver of exemptions, the debtor may avoid the fixing of a lien on an interest of the debtor in property to the extent that such lien impairs an exemption to which the debtor would have been entitled under subsection (b) of this section, if such lien is

(2) a nonpossessory, nonpurchase-money security interest in any

(A) . . . goods . . . held primarily for the personal, family . . . use of the debtor . . ."

The deletion of the word "household" modifying "goods" substantially alters the meaning of § 522(f), not coincidentially, in favor of the Debtors' position.

Such an omission in quoting the controlling statute in this case cannot be the result of oversight. In this context, counsel's attention is directed to Disciplinary Rule 7–102(A)(5) of the Code of Professional Responsibility, which requires that "[i]n his representation of a client, a lawyer shall not [k]nowingly make a false statement of law or fact." The duty to deal honestly and candidly with the court, including the disclosure of adverse authority, is even greater than the duty owed to one's client. *United States v. Ott*, 489 F.2d 872 (7th Cir. 1973); *People ex rel. Chicago Bar Ass'n v. Martin*, 288 Ill. 615, 124 N.E. 340 (1919); *Langen v. Borkowski*, 188 Wisc. 277, 206 N.W. 181 (1925). As stated more than 60 years ago, and as is still most true today,

Counsel must remember they, too, are officers of the courts, administrators of justice, oath-bound servants of society; that their first duty is not to their clients, as many suppose, but is to the administration of justice; that to this clients' success is wholly subordinate; that their conduct ought to and must be scrupulously observant of law and ethics; and to the extent that they fail therein, they injure themselves, wrong their brothers at the bar, bring reproach upon an honorable profession, betray the courts and defeat justice.

*In re Kelly*, 243 F. 696, 705 (D.Mont.1917).

Returning to the merits of the objection, it would impermissively strain the language of § 522(f)(2) to conclude that the Debtors' camper trailer comes within the meaning of "household goods" or any of the other enumerated items listed in § 522(f)(2). It is

---

**3.** Debtors did not raise this issue in their answer to the complaint, but included it in a memorandum. Since the Plaintiff has addressed the question in its own memorandum, eliminating surprise, the issue will be considered.

apparent from Congress' careful delineation of the types of property for which nonpossessory, nonpurchase-money security interests could be avoided, that it was not intended that the section would be applicable to the type of property in dispute here.

The Debtors' objections are without merit. The Plaintiff's complaint for reclamation is granted.