In re HAINES & BAKER EXCAVATING, INC., Debtor.

Maurice A. EDELMAN, Trustee, Plaintiff,

v.

GRAND VALLEY NATIONAL BANK, Defendant.

Bankruptcy No. NG 80–02304.
Adv. No. 81–0825.

United States Bankruptcy Court, W.D. Michigan.

Dec. 10, 1982.

Schmidt, Howlett, Vant Hof, Snell & Vana (James D. Gregg), Grand Rapids, Mich., for plaintiff.

James J. Nopper, Grandville, Mich., for defendant.

## OPINION

### REPOSSESSION—DE FACTO CORPORATION—CONTEMPT

DAVID E. NIMS, Jr., Bankruptcy Judge.

Maurice A. Edleman, the duly appointed trustee of Haines & Baker Excavating, Inc., (Haines & Baker), filed this adversary proceeding against Grand Valley National Bank (Bank), a National Banking Association, for a determination that a security interest of the Bank in a Case 580 C Loader Backhoe (backhoe) was not perfected, was invalid as to trustee, that backhoe was at all times an asset of this estate and that he is entitled to a judgment for $12,821.39, the amount paid to the Bank for the backhoe with interest from the date of sale at the rate of 12%, costs, and attorneys fees.

Haines & Baker filed a voluntary petition under 11 U.S.C. Chapter 11 on July 31, 1980. This case was converted to a case under Chapter 7 of Title 11 of the United States Code on December 2, 1980.

John F. Haines (Haines), president of Haines & Baker, had done business with the Bank prior to the formation of the corpora-tion. He operated an excavating business under the name of John F. Haines Company (Haines Co.) as a sole proprietor. As early as April 1977, a financing statement, executed by Haines as debtor on a scraper and "all existing and after acquired machinery and equipment" was filed in the office of the Secretary of State. In December 1977 a security agreement on inventory, accounts and "present and after acquired machinery and equipment" was signed by Haines. Two more financing statements in the name of Haines were filed in January 1978 covering certain described machines and also equipment in general.

On March 30, 1978, Haines & Baker provided the Bank with a certified copy of a resolution authorizing the president, Carroll F. Baker (Baker) and its vice-president, Haines, to execute and procure loans from the Bank. Haines & Baker then executed a security agreement and assignment on accounts receivable, contract rights, etc., a security agreement on inventory, and a continuing general guaranty of the indebtedness of Haines & Baker to the Bank signed by Baker and Haines. The Bank understood that Haines borrowed money to form a new corporation. Baker and Haines understood that Haines & Baker existed from the fall of 1977. The articles of incorporation had been signed, a corporate meeting had been held and a checking account was opened at the Bank in the name of Haines & Baker into which all monies from the corporate operations were deposited. Sometime later they learned that their attorney had failed to file the articles of incorporation until August of 1978 or 1979. On January 12, 1979, the Bank made a loan to Haines & Baker for the purchase of the backhoe on which it had an option to buy. A security agreement was executed by Haines & Baker through its officers Baker and Haines. A financing statement on the backhoe was prepared and was filed in the office of the Ottawa County Register of Deeds but was never filed with the Secretary of State. The only financing statement with Haines & Baker as debtor and the Bank as secured party filed in the Sec-

retary of State's office was one filed April 10, 1978, covering "All present and future accounts, contract rights, general intangibles and Chattel Papers. All present and after-acquired inventory of debtor, and accounts, contract rights, chattel paper and general intangibles arising out of the retail sale or other disposition of any of the foregoing."

In the spring of 1980, Haines & Baker moved the backhoe to Florida where it was used by another corporation known as Haines & Baker Excavating Inc. of Florida. That corporation ceased to operate July 16, 1980. When Haines & Baker filed its Chapter 11 petition, the backhoe was on the site of a job on which Haines & Baker Excavating Inc. of Florida had been working before it ceased operations. By agreement with the trustee, Haines was to put the backhoe in a safekeeping place until it would be abandoned or sold. There was no permission to operate.

What happened then was complicated and involved. The parties are not too far apart as to the actual facts—only the legal effect of those acts. The Bank was well aware of the bankruptcy proceedings. An officer attended the first meeting with its attorney. It was also aware of the automatic stay and the necessity of obtaining relief before taking any action in regards to the property of the estate. It was at the time of the first meeting that the Bank's collection manager was informed by the Bank's attorney that its lien on the backhoe might not be perfected.

At the time of filing the Chapter 11 case, Haines was aware of his personal liability to the Bank both because of his personal loans and because of his guaranty on the Haines and Baker loans. He made payments to the Bank on the other transactions. In the fall of 1980, he started working for Gulf Coast Excavating Corp. (Gulf) and later became a stockholder and an executive in Gulf. There had been discussions between Haines and the Bank about the possible sale of the backhoe and the Bank did threaten to repossess if it didn't get its money. February 18, 1981, a Bob Cinelli

(Cinelli), president and managing officer of Gulf telephoned the Bank's collection manager and indicated his interest in purchasing the backhoe. It was agreed that the Bank would sell the backhoe for the amount owed, $12,346.39. Cinelli was aware of the bankruptcy proceeding and had asked the Bank to obtain an abandonment order from the trustee and the Bank stated that it would.

On May 27, 1981, the Bank received a check for $12,821.39. This included $475.00 for interest and attorney's fees. On May 26, 1981, the following document was prepared on the letterhead of the Bank:

"To Whom It May Concern:

Please be advised that this will serve as a bill of sale.

Bob Cinelli has purchased a Case Loader Backhoe Model 580C Serial # 8963472 from Grand Valley National Bank for the amount of $12,821.39 (twelve thousand eight hundred twenty one dollars and thirty nine cents).

This forementioned item was involved in a Bankruptcy through Haines & Baker Excavating a now defunct Michigan Corporation.

Bill Karolkiewicz
Collection Manager"

On receiving this bill of sale, Cinelli called the collection manager because the bill of sale should have been in the name of Gulf. He also indicated the need for a release of the lien for his bank. The Bank then prepared a release of its lien as follows:

"GV Grand Valley
 National Bank

"May 26, 1981
To Whom It May Concern:

Please be advised that Grand Valley National Bank no longer holds any secured interest in a Case Loader Backhoe Model # 580C Serial # 8963472.

The loan has been paid releasing our secured interest.

Bill Karolkiewicz
Collection Manager"

Both Haines and Cinelli also called about the abandonment order from the trustee.

The collection manager said he was in the process of getting one. Haines testified that on one occasion he was put on the telephone to the collection manager's superior, Roger L. Yeomans, and the Banks attorney and that they stated there was a problem because the lien had not been filed. On another occasion, the Bank assured Cinelli that the Bank owned the machine. The abandonment order was never received. Instead, on June 22, 1981, the bank sent the following letter to Cinelli, Haines and Gulf:

"GV Grand Valley
 National Bank

June 22, 1981

"Mr. Robert Cinelli
Mr. John Haines
Gulf Coast Excavating, Inc.
94 W. South Highway
North Port, Florida 33596
Re: Case Loader # 8963472
Gentlemen:

It appears that the parties original understanding is subject to question on the secured position on the case loader.

The Bank's position at this time is as follows:

Haines & Baker and Haines & Baker Excavating owed the Bank, with costs some $12,821.39.

The Bankruptcy Trustee and the Attorneys involved authorized Mr. Bill Karol of the Bank to work out a settlement of the Bank's claim with John Haines. The Bank arranged with Mr. Haines and Mr. Cinelli to pay off the Bank's claim with the Florida people retaining the use, possession and eventual ownership of the loader.

If these proceedings which resulted in the Bank being fully paid were based on a Trustee's mistake, the Bank feels that it is up to the Trustee to reclaim the loader or work out a settlement with Mr. Haines. The Bank's claim has been fully satisfied by Mr. Haines and his associates. It is suggested that Mr. Haines may have to pay the Trustee half of the appraised value of the loader which was valued at some $10,000.00. The Bank is agreeable

to working with Mr. Haines to accomplish such a result, but any liability must, in the end, be assumed by Mr. Haines and/or his former associate, Mr. Baker. A review of the documents clearly show that Snyder originally sold the loader on a lease-purchase basis to Mr. Haines' company. The Bank had a broad form security agreement and UCC filing on the company. Purchase was completed by Mr. Haines' corporation, financed by the Bank with a purchase credit from Mr. Haines' company lease. The Bank, in addition to the company UCC filing, had various corporation UCC filings, which were intended to cover all assets, including after acquired assets. Under these circumstances the Bank at this time understandably declines to remit some $6,000.00 to the Bankruptcy Trustee.

Whatever interest the Bank may have, we will assign to Gulf Coast, or Mr. Cinelli, or Mr. Haines. I believe this accurately reflects the present situation.

If you have any questions, please feel free to contact me.

Sincerely,
GRAND VALLEY NATIONAL BANK
Roger L. Yeomans
Vice President"

The collection manager testified that when a vehicle was possessed by the Bank, a bill of sale from the Bank often would be executed. He felt this was similar to a repossession sale although the Bank never got possession.

Upon receipt of the letter of June 22, Cinelli made several telephone calls to the Bank without success. The officers of the Bank would refuse to talk to him or would not return his calls.

The collection manager did testify that he was told by the Bank's attorney to proceed with the Cinelli deal so he assumed that the attorney had worked out the problems with the trustee.

Cinelli testified that he would not have paid the money to the Bank if he had not been assured that an abandonment order would be obtained. He would not have

paid the trustee more than $13,000 for the backhoe.

■ This court has jurisdiction of this case under 28 U.S.C. Section 1471. No objection was made to the jurisdiction of the Bankruptcy Court except as to a possible dispute between the Bank and Gulf or Cinelli. The court refused to allow the addition of either Gulf or Cinelli as a party. I am aware of the recent opinion of *Meeker v. Livengood Real Estate Co.,* 22 B.R. 745, 9 Bankr.Ct.Dec. 836 (S.D.Ohio 1982) in which Judge Spiegel reversed the Bankruptcy Court's refusal to grant appellant's motion to dismiss in view of *Northern Pipeline Construction Co. v. Marathon Pipeline Co.,* —— U.S. ——, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982). Since appellant had raised the issue prior to the United States Supreme Court decision, he had preserved his right on appeal. That was a suit brought by debtors in a Chapter 13 case with the wife claiming damages, misrepresentation and fraud. Here the Bank never filed a motion to dismiss and never claimed any constitutional basis for its position. However, even if it had, this case, involving the validity of a lien on property of a bankruptcy estate in which the debtor had constructive possession at the time of filing, is of the type that Bankruptcy Courts have always had, and must have jurisdiction over.

Once having jurisdiction, the Bankruptcy Court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105.

To determine the validity of the Bank's lien, we must look to Article 9 of the Uniform Commercial Code. Mich.Comp.Laws § 440.9102 [Mich.Stat.Ann. § 19.9102 (Callaghan 1981)] A security interest was properly created in the Bank by the execution of the security agreement. Mich. Comp.Laws § 440.9203 [Mich.Stat.Ann. § 19.9203 (Callaghan 1981)] However, an unperfected security interest is subordinate to the rights of a lien creditor existing prior to perfection. Such a lien creditor means, *inter alia,* a trustee in bankruptcy from the date of the filing of the petition. Comp.

Laws § 440.9301 [Mich.Stat.Ann. § 19.9301 (Callaghan 1981)], 11 U.S.C. § 544(a)(1) A financing statement must be filed to perfect all security interests with certain exceptions that do not apply in this case. Comp.Laws § 440.9302(1) [Mich.Stat.Ann. § 19.9302(1) (Callaghan 1981)] The proper place to file, when the collateral is equipment, other than that used in farming operations, is the office of the Secretary of State. Comp.Laws § 440.9401(c) [Mich. Stat.Ann. § 19.9401(c) (Callaghan 1981)] The general classification of goods as defined by the U.C.C. is (1) consumer goods, (2) equipment, (3) farm products, and (4) inventory. In this case I would find that the backhoe is equipment. Comp.Laws § 440.9109 [Mich.Stat.Ann. § 19.9109 (Callaghan 1981)].

As there was no proper filing of the financing statement on the backhoe or equipment generally, I would find that the security interest of the Bank was not perfected and is subordinate to that of the trustee.

In its brief, the Bank, for the first time claims that there was no corporation. This was not pleaded as a defense. The Bank put in no proofs as to the corporate status of Haines & Baker. In the course of taking Haines' deposition, trustee's attorney asked how old the corporation was in January 1978. Haines answered:

"A The corporation, the problem of the corporation was Haines and Baker was a company to which was not incorporated, I have to rephrase myself there, for the simple reason Haines and Baker existed from the fall of 1977, but it was not incorporated until—I am not sure of the date exactly, but it had to be August, I believe, of nineteen—it was either 1978 or 1979, due to an error in the attorney situation up in Michigan, they did not become incorporated till later on, which we did not know that this was the case, I and Carroll Baker as owners of the company."

Since the Bank did not obtain a certified copy of the Articles of Incorporation, we only have Haines testimony that the debtor

might have been incorporated in January 1979 or it might not have been. The question was never put in issue in the pleadings. However, even if Haines & Baker were not a dejure corporation in January, 1979, I would find that it was a de facto corporation under Michigan law:

"A de facto corporation may be defined as one so defectively created as not to be a de jure corporation, but nevertheless the result of a bona fide attempt to incorporate under existing statutory authority, coupled with the exercise of corporate powers, and recognized by the courts as such upon the ground of public policy in all proceedings except a direct attack by the state questioning its corporation existence. In other words a corporation attains de facto existence by a good-faith attempt to organize for an authorized purpose under a valid statute." 6 *Mich. Civil Jurisprudence* (Callaghan 1958) Corporations § 25.

"A de facto corporation has the same capaicty as a de jure corporation to enter into contracts, and it is sufficient, therefore, to show a de facto corporate existence in order to sustain an action by or against an association as a corporation on a note, bond, or other contract." 6 *Mich.Civil Jurisprudence* (Callaghan 1958) Corporations § 25.

"One who has dealt with or recognized a profit corporation as such cannot afterwards attack the legality of its organization." 6 *Mich.Civil Jurisprudence* (Callaghan 1958) Corporations § 28.

"The doctrine in relation to estoppel to deny corporate existence by reason of recognition of a pretended corporation by dealing with it rests upon the ground that such dealing creates relations and encourages conduct which there be difficulty in undoing, or which it would be inequitable to undo." 6 *Mich. Civil Jurisprudence* (Callaghan 1958) Corporations § 28.

■ "All legal or equitable interests of the debtor in property as of the commencement of the case * * * " is a part of the estate of the debtor. 11 U.S.C. § 541(a)(1) This property, if not abandoned by the trus-

tee, remains property of the estate unless the court orders otherwise. 11 U.S.C. § 554(d) The court may avoid a transfer of property of the estate that occurs after the commencement of the case. 11 U.S.C. § 549 To the extent that the court avoids a transfer under 11 U.S.C. § 549, "the trustee may recover for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from the initial transferee of such transfer or the entity for whose benefit such transfer was made; or any immediate or mediate transferee of such initial transferee." 11 U.S.C. § 550(a) Thus, I conclude that the trustee may recover the purchase price of the backhoe to wit, $12,821.39. I cannot accept the Bank's claim that it merely accepted payment from Gulf as a payment on a debt. The bank negotiated with Cinelli for the sale of the backhoe, it gave Cinelli a bill of sale, it gave a release of its security interest, it understood that Gulf would take the equipment, and it knew that Gulf was insisting on an abandonment order from this court. The officer handling the transaction realized that this was in effect a repossession and sale of collateral and that the final intent and effect was to transfer title and possession to Gulf thereby perpetrating a fraud on Gulf. The Bank knew that in spite of its contentions to the contrary, it could not obtain an abandonment from the trustee.

11 U.S.C. Section 362 provides:

"(a) Except as provided in subsection (b) of this section, a petition filed under section 301, 302, or 303 of this title operates as a stay, applicable to all entities, of—

" * * *

"(3) any act to obtain possession of property of the estate or of property from the estate;

"(4) any act to create, perfect, or enforce any lien against property of the estate;

"(5) any act to create, perfect, or enforce against property of the debtor any lien to the extent that such lien secures a claim that arose before the

commencement of the case under this title;"

The Bank flagrantly violated this stay. It knew of the bankruptcy case, it knew of the automatic stay, it was aware of the fact that its lien was not perfected and had been told so by two of its attorneys. It must have been aware of its right to apply for relief from stay. It elected not to take this route. Unfortunately, because of lack of funds in the estate, the trustee was unable to move the backhoe to Michigan and proceed to dispose of it locally. He had no choice but to call upon the debtor's officer at the scene to protect the estate's property. The Bank took advantage of this situation to work out its adroitly concocted scheme to obtain full payment of its loan and leave to the trustee the expense and inconvenience of attempting to proceed against Cinelli, Gulf or Haines.

 The courts have long used the procedure of civil contempt in order to enforce the orders of the courts. Even the absence of willfulness does not ensure relief from civil contempt. Civil contempt is a sanction to enforce compliance with an order of the court or "to compensate for losses or damages sustained by noncompliance." *McComb v. Jacksonville Paper Co.,* 336 U.S. 187, 69 S.Ct. 497, 93 L.Ed. 599 (1949) See also *U.S. v. International Business Machines Corp.,* 60 F.R.D. 658 (S.D.N.Y.1973) Appeal dism. 416 U.S. 976, 94 S.Ct. 2378, 40 L.Ed.2d 756 (1974), Lv. to file Writ of Mandamus den. 416 U.S. 980, 94 S.Ct. 2413, 40 L.Ed.2d 777 (1974), Cert. Den. 416 U.S. 995, 94 S.Ct. 2409, 40 L.Ed.2d 774 (1974); *National Labor Relations Board v. Vander Wal,* 316 F.2d 631 (9th Cir.1963); *McGoff v. Rapone,* 78 F.R.D. 8 (E.D.Pa.1978).

In one case, which predated the Bankruptcy Code of 1978, a debtor that had petitioned for relief under Chapter XI had a deed of trust on a condominium. General contractors filed an action in the United States District Court for the Southern District of Mississippi to enforce materialmen's liens against the trust. Debtor was required to deposit $76,000 in that court. The bankruptcy judge for the Southern District

of New York, where the debtor had filed, held the contractors, two corporate officers and their lawyers in contempt and certified the matter to a district judge. The district judge ordered that debtor be paid all costs plus reasonable attorney's fees for prosecuting the Mississippi action and the contempt proceedings. On appeal, in *In re Fidelity Mortgage Investors,* 550 F.2d 47 (2d Cir. 1976) Cert. den. 429 U.S. 1093, 97 S.Ct. 1107, 51 L.Ed.2d 540 (1977), reh. den. 430 U.S. 976, 97 S.Ct. 1670, 52 L.Ed.2d 372 (1977), the court affirmed and stated:

> "The issue here is a procedural one: whether Camelia and Farnale should have secured permission from the New York bankruptcy court before proceeding with their action in Mississippi.
>
> "Rule 11–44 required Camelia and Farnale to secure such prior permission. They deliberately did not and, hence, were in contempt of the New York bankruptcy court. That Camelia and Farnale may have a valid substantive position under Mississippi law does not mitigate, excuse or justify their willful procedural violation of the federal bankruptcy rules."

Since the new Code was adopted, several cases have held entities to be guilty of civil contempt for having violated the automatic stay under 11 U.S.C. Section 362. As stated by one court, debtor's "filing their petition resulted in an automatic stay which is similar to an injunction." *In re Coleman American Companies, Inc.,* 6 B.R. 251 (Bkrtcy.D. Colo.1980) When a party violates that stay, he is not acting contrary to the order of a court or even a court rule—he is violating an order of Congress.

In *In re Reed,* 11 B.R. 258 (Bkrtcy.D.Utah 1981), Judge Mabey held in two cases that creditors had violated the automatic stay and were guilty of civil contempt. He awarded full damages to debtor including court costs and attorneys' fees. To try to improve on Judge Mabey's excellent definitive opinion on the automatic stay and civil contempt would be a waste of judicial effort so I merely adopt his reasoning. See also *Government National Mortgage Corp.*

v. *Adama Mortgage Bankers, Inc.,* Bankr.Law Rep. (CCH) ¶ 68,237 (Bankr.N. D.Ga.1981); *In re Gibson,* 16 B.R. 682 (Bkrtcy.S.D.Ohio 1981) (also allowed monies for "anxiety", harassment, and inconvenience); *In re Wariner,* 16 B.R. 216 (Bkrtcy. N.D.Tex.1981); *In re Sandmar Corp.,* 12 B.R. 910 (Bkrtcy.D.N.M.1981); *Elder v. City of Thomasville,* 12 B.R. 491 (Bkrtcy.M.D.Ga. 1981); *In re Batla,* 12 B.R. 397 (Bkrtcy.N.D. Ga.1981).

In view of the clear violation of the automatic stay, there will be added to the judgment for the money value of the backhoe all costs of this adversary proceeding plus reasonable attorneys' fees.

The court has considered that even if the Bank had not violated the automatic stay, trustee would still have been compelled to bring an adversary action to remove the Bank's lien. However, it is so clear that the lien was not perfected and that the Bank's attorneys had recognized this fact, I cannot believe that there would have been any litigation except for the Bank's raising a defense made possible only by its wrongful action.

There being no proof as to amount of interest, no interest is allowed in determining the amount of the judgment. However, the judgment will carry interest from the date of judgment to the date of payment in the amount of 9.07%. 28 U.S.C. § 1961, as amended April 2, 1982, Pub.L. 97–164, Title III, § 302(a), 96 Stat. 55.

Thus, a judgment may be entered ordering the bank to turn over to the trustee the sum of $12,821.39, together with all costs of this proceeding and reasonable attorneys' fees. Interest on the judgment is allowed at the rate of 9.07%.